at All, Caterpillar Logistics Service, Inc., Appley, by Christopher Drinkwine. Mr. Block, you may proceed. Thank you, Justice Holdredge, and good afternoon to the Court. And, Mr. Drinkwine, good afternoon. After a decade and a half of filing the Section 8A petition, we're finally able to appear before the Supreme Court.  and get to the merits of our case. I think the crux of the case is really, the joinder, if you will, is at page 20 of the defendant's brief, where it states that, under the plain language of the statute, he is only entitled to recover reasonable medical expenses, and this is italicized, necessary to diagnose or cure the effects of his injury, citing Section 8A of the Act in the absolute cleaning case. And, moreover, he goes on, he is not entitled to recover expenses for all medical services and pharmaceuticals that he desires and are within the bounds of reason. Now, once in a while, what's in briefs also makes it into opinions, as I'm sure the justices know. I couldn't imagine a justice dealing with an act that's supposed to be liberally construed to protect the injured worker to write that an injured worker is not entitled to recover expenses for all medical services and pharmaceuticals that he desires and are within the bounds of reason. If I might, the first statement about Section 8A, the Act actually provides, as far as necessity, it's defined as that which is reasonably required to cure or relieve from the effects of the accidental injury. And that's why the absolute cleaning case, which they cite, decided that a petitioner could have chiropractic treatment, which only provided temporary relief, didn't cure anything, because that's included with Section 8A of the Act. And, unfortunately, with my client's condition, that's what a lot of this is. We cite the Rockford Clutch case as the number one case that deals with the issue. And specifically, and I know courts don't like to be read to, but it's only two lines, the Workers' Compensation Act is not designed simply to protect employees who follow the best medical opinions of the day. It is designed for employees with divergent personalities, beliefs, and fears. If a claimant's response to an offer of treatment is within the bounds of reason, and here's where the issue is, his freedom of choice should be preserved even when an operation might mitigate the employer's damages. And I believe what the Rockford case establishes in all workers' compensation cases, in terms of medical treatment, is that there should be a freedom of choice with the employee. As a matter of fact, they go on to say the claimant should be entitled to decide on the basis of whatever competent medical advice he chooses to follow, whether he should admit to a major surgery. That leads us to the Bob Red remodeling case, which this court decided, and we have a difference of opinion on whether the facts are on point or not. I believe they are because it's a Section 19D petition. I'm sorry, Counsel, you said whether the facts are, and then I didn't hear you. Whether the facts are something or not. Are applicable to our situation, I believe. I'm rephrasing, Your Honor, but yes, because Bob Red remodeling entailed a traumatic brain injury case, which is a neurological condition, just as our case here deals with a neurological condition. But because it's a Section 19D, the issue was the treatment that the injured worker was following, whether it was unreasonable to the extent that it was an injurious practice and should cut off benefits. And where the other proposed treatment came in was to show that the treatment he was pursuing was unreasonable. And witnesses have testified that the doctor was not current in his understanding of traumatic brain injury and that his treatment was inadequate. And he was lacking like vestibular therapy and things you see with traumatic brain injury type cases. And while there was an offer of treatment, that wasn't the issue in the case. And the court found that the doctor, although an internist, was qualified. And please bear in mind, in our case, I don't believe, and Mr. Drinkman will correct me if I'm wrong, that we have an issue, with the exception maybe of Dr. Itkin, that any of the doctors in this case that are rendering opinions are not qualified. They're all actually well qualified. And what Bob Red Re-modeling held is that claimant's behavior was reasonable under the circumstances. As he was following the advice of his own qualified physician, we could not say that his choices were unreasonable. And then they do add, which is a hook for Mr. Drinkman, I believe, that at the very least, we certainly could not say that an opposite conclusion to the commission on this issue is clearly apparent. The important thing, though, of the case is it is applying Rockford-Clutch and a reasonable bounds test to its decision. And I think in both cases, the common thread is that the worker should be able to follow treatment from a competent doctor, absent the doctor going beyond reasonable bounds. And I think that's consistent with the purpose of the act. And I think it's consistent with the practice of medicine. I don't know many doctors that go beyond the reasonable bounds in treatment. Usually treatment is repetitive, really. They tend to specialize in a particular type of case and they prescribe the same type of treatment for that case. If they do go beyond reasonable bounds, of course, they face civil and professional liability both. So they're certainly not going to want to do that. And I think a reasonable bounds test shows respect for these doctors. The history of the case, and I'll be very brief on this because I know you've read the briefs now, but you have a 1994 accident. My client's only 27 at the time. He starts with the company doctors, and by the time he gets to Loyola, it's too late to reverse it. But at Loyola, they find a hot bone scan from an inflammation, and they diagnose something called reflex sympathetic dystrophy, which is now called complex regional pain syndrome. And with that, starting with Loyola, which is one of Chicago's major medical institutions, very reputable, they start him on opioids and benzodiazepines, plus a number of different modalities, integrated manual therapy, acupuncture, physical therapy, aqua therapy, biofeedback, psychological, epidural steroid injections. He winds up going on to Rush. A Caterpillar's nurse actually asked him to go there, a nurse case manager. Then he tries to go to Arizona, where he sees a Dr. Sinel, who also notices that the condition includes something called myofascial pain syndrome, which Dr. Stanton Hicks, which we'll get to him, he's the defendant's second IME doctor, also agreed with. So he has pain, which will be all over his body, unfortunately, from this condition. At Rush, he asked for a place closer to home, so they referred him to a Dr. Gorski, who was the director of the pain clinic at Silver Cross, then went into private practice on his own, and then retired. He tested a bunch of different formulas, including fentanyl for my client, and together they figured out which worked best to decrease pain, handle the anxiety, handle the muscle spasms, and that's what Dr. Gorski put him on for long-term opioid use. I think he even had him psychologically tested for that. My client then goes, after Dr. Gorski retires, my client goes to, I think Joliet Pain Clinic was actually Dr. Gorski's private practice clinic, but he then goes to a place called Pain Care America, where two doctors are practicing that are major players in the case. One is Dr. Kelly, who is a former associate professor of neurology at Northwestern, and he also taught neurology at Southern Illinois University Medical Center. So again, a well-qualified doctor. Another doctor he met there, because Dr. Kelly left that place, they were closing and ultimately did close, was Dr. Zabiega, who was trained in neurology and board-certified, and the training was at University of Chicago. Again, well-qualified. In May of 2010, the defendant has a utilization review done. That doesn't require a personal physical examination by Dr. Rubino, but they limit it to biofeedback, acupuncture, and ESIs. After taking her deposition, Dr. Rubino was clear that she didn't want to stop any treatment, and the only thing she had issue with was the way epidural steroid injections were being used. In October of 2011, then they have an IME by Dr. Ickens, technically a Section 12 examination, and he finds everything normal, nothing on physical examination on the arms or legs, and at that point all treatment stops, because that's what this doctor found. And again, he's a board-certified neurologist. Now, the adjuster knew at that point that my client had been taking opioids and benzodiazepines for a long time because of this accident. The prescription medications, they all arose from the discovery of the diagnosis at Loyola. Yet she basically cold-turkeyed him and cut off all treatment. And needless to say, ever since that time, there was no love lost between my client or Caterpillar. A month or two later, Medicare picked up the prescriptions. But in the interim, there was increased pain, insomnia, spasms, more GI issues. Dr. Zabiega noted wasting and edema. And once Medicare picked it up, then that tells us that these medicines are within Medicare guidelines, which is another test, I think, when you're talking about reasonable bounds. By July of 2015, we had taken the depths of Drs. Kelly, Dr. Zabiega. They were the two guys who were from the pain clinic. And Mr. Schiavi, who was the integrated manual therapy, massage therapist person, and he noticed the differences objectively in Mr. Montgomery with treatment and without treatment and testified to them. And Dr. Rubino, who was the UR doctor for Caterpillar. I think Dr. Kelly, Dr. Zabiega, and Mr. Schiavi made a strong case, evidence-based, why the drugs worked well, the modalities worked well, and when they stopped, things went very south. Dr. Zabiega, by the time of the depositions, was the treater and the only treater, and he was only treating CRPS, not any radiculopathies, not anything else. And the importance there is he was the doctor that his deposition went through all the medicines and went through the modalities and explained why they all worked well. The commission ultimately decided some of those modalities that he was prescribing only for CRPS because they also could treat other things would be denied. In any event, Dr. Rubino, their UR doctor, among other things, testified that his autonomic nervous system was affected by CRPS, as other doctors did as well. And she had, as far as acupuncture goes, she said that and a spine stimulator potentially, but at the time acupuncture was the only thing treating his autonomic nervous system. And that's the nervous system that handles like our skin temperature, our breathing. It's a very important part of the nervous system. The other thing Dr. Rubino testified to is that part of the reason for non-certification was there was no schedule. So in December of 2015, we sought a life care plan by Myla Carlson, a professional life care planner, which was certified by Dr. Zabiega, the doctor who was only treating CRPS and who was a treater at the time. So once that was done, we're basically ready for trial on the issue of whether Dr. Itkin's findings that he didn't have CRPS at all were true or not. And Caterpillar finally realized maybe we ought to get a real CRPS doctor and do a real IME. So they asked of the commissioner and he indicated he would allow. And they did get a IME from July of 2016 by Dr. Stanton Hicks, another qualified doctor, no question about it. They sent him the Itkin report. And the only reason they would do that is to hope he would find there was no CRPS. And what Dr. Stanton Hicks wrote was, noted is the IME report by the neuro doctor Itkin in 2010 that no objective signs to support a diagnosis of CRPS were found. And that's the only comment he made on the IME. In terms of his physical examination, in addition to significant findings on the right upper extremity, the right lower extremity had edema, discolored coarse hair growth, weak peroneal and anterior tibialis muscles, and a give away clonus greater than the peroneal muscle and the skin color that was dusky and hyperhidrosis, which is excessive sweating. The left lower extremity marked hair loss, atrophy in three muscles and muscle strength weakness. So this is quite the contrary to what Dr. Itkin wrote. And the importance here, when we're dealing with what tests should be used in terms of ADA petitions, is there are many Dr. Itkins out there. And it's unfortunate for $1,500 or $2,000, some of them will say darn near anything. And please remember, when you're not finding atrophy, when you're comparing legs, and you talk about muscle waste, you don't need an MD degree, you need a tape measure. That's how bad it is. So in any event, with all treatment cut off, we proceed to hearing. But the important point for our purposes is a reasonable bounce test prevents a doctor from simply saying, I don't agree with the treatment. They have to make a case that basically, in my opinion, that a competent doctor wouldn't prescribe that, or it's experimental, or it's out of bounds, something way beyond just that they disagree. Because IME doctors can be a real problem in workers' compensation, and that's the practicality of what we're facing. And I think, well, to be honest, I'm not thrilled that while the medical aspects of this deal with opioids, if I could have picked my facts, I might have picked something better. But I think Dr. Itkin is a great example of why we need to be very careful about what rule we require for a commission to decide when treatment is reasonably required to relieve from the effects of the injury. And I think both Rockford Clutch and Bob Redd and the reasonable bounce test applies to a working person's freedom of choice, which should equally apply here. And I think that is the crux of our case. I think the reasonable bounce test accomplishes that. Without the reasonable bounce test, you could just have an IME doctor say, I don't think this is appropriate. And the commission can find that. I don't think that's right. I don't think that's a good test. And let me give an example. Mr. Block, the red light went on here a little bit ago on your timer. Oh, I'm sorry, Judge. Judge, if I could, could I have 30 seconds on one other issue? Very briefly and wrap up. You'll have time. Just simply, counsel has attacked my brief. All I can tell you is I did it myself. I've done a lot of briefs. I thought we had an exceptional statement of facts. It did have all the citations. And my understanding of the rule is that when you went to the argument part, if you were going to say something that's not in the statement of facts or something or use a direct quote, then you put in a citation. I did that. But I didn't think you have to re-put in all the citations that were in the statement of facts. If I caused anybody any extra work, I apologize. I want to let you know I did not intend that to happen. My apologies. Thank you. Any questions from the court? Yes. As long as you're ending right where I was going to ask. First of all, aren't Bob Redd and Rockford Clutch, they're both 19D cases? No. And I guess my concern is, you know, where employees are refusing treatment that the employer thinks might be mitigating their damages, my concern is you're asking us to import this reasonable bounds test into AA and I personally hadn't had a lot of dissatisfaction with, you know, necessary treatment, which is reasonably required to cure the ill effects.  Yeah. Just a couple of things very, very quickly. Thank you for the extra time. Rockford Clutch was not a 19D case. Rockford Clutch was simply an employee that was refusing treatment. I don't believe it was a 19D case anyway. I think he was refusing spine surgery. But the point is, and I think the important point of Rockford Clutch is. Yeah, refusing a back surgery. Yes. Yes. But I think the point of Rockford Clutch is there is a freedom of choice. And that's what this is all about. When competent doctors disagree, I think acupuncture is a good example, for example. Dr. Rubino was a qualified acupuncturist. He said acupuncture absolutely should be used. Dr. Stan Hicks said no. And the question is, in reasonable bounds, I think you're saying, yeah, it's appropriate because you have a qualified doctor. So you're not happy with what's in 8A? No, I am. But 8A says, the definition of 8A is reasonably required to relieve from the effects of the accidental injury. What I'm saying is how do you define reasonably required? And I think the definition of that is within reasonable bounds. And I don't think there's a, and just like in their quote in their brief, there's no case that says no. There's no case that says yes. But I think the point is that clearly a freedom of choice should go with the petitioner. And I think that's destroyed if an IME doctor, especially Dr. Erickson, can say this treatment's not right with nothing more. I hope that answers your question, Your Honor. Further questions from the court? Hearing none, you'll have time to reply, Mr. Blunt. Thank you. Thank you, Your Honor. Mr. Drinkwine, you may respond. Thank you, Your Honor. May it please the court and good afternoon. Counsel Chris Drinkwine on behalf of Caterpillar Logistics Incorporated. The commission followed this court's direction to determine whether the proposed prospective medical services and pharmaceuticals itemized in the life care plan are necessary and whether their projected costs are reasonable. The commission applied the correct, reasonable, and necessary standard as directed by this court, and as is appropriate to a Section 8A request for medical expenses. The Rockford clutch within reasonable bounds standard is not applicable to this situation, and this court did not direct the commission to apply that standard. Instead, in accordance with this court's directions, the commission made findings with respect to the necessity and reasonableness of the proposed prospective medical services and pharmaceuticals itemized in Petitioner's life care plan. Those findings must be upheld unless they are contrary to the manifest weight of the evidence, and no rational trier of fact could have disagreed with the commission. Petitioner has not shown that the commission's findings were contrary to the manifest weight of the evidence, and therefore the commission's decision must be affirmed. Petitioner's contention that the within reasonable bounds standard applies in this case is wholly incorrect, as Justice Mullen just outlined. It fails to recognize the difference and appreciate the difference between Section 8A and Section 19D of the Workers' Compensation Act. Under Section 8A, an injured employee is only entitled to recover, and an employer is only required to pay, reasonable medical expenses necessary to diagnose or cure the effects of the injury. But under Section 19D, if an employee refuses to submit to such treatment as is reasonably essential to promote his recovery, the commission may, in its discretion, reduce or suspend the compensation of any such injured employee. In other words, the employer can be absolved from liability where the proffered medical services have been refused by the employee. So then our Supreme Court in Rockford-Clutch provided an exception to the 19D employer absolution from liability where the employee's refusal of the reasonable and essential treatment is within the bounds of reason. And that is true even where the treatment might mitigate the employer's damages. So Rockford-Clutch established the within reasonable bounds exception to Section 19D. It did not set forth the standard for determining in the first place whether a medical expense is reasonable and necessary to diagnose or cure the effects of a work injury that the employer is required to pay under Section 8A. In short, Rockford-Clutch and later cases like Bob Red remodeling are absolutely Section 19D cases, not Section 8A cases. So the petitioner is permitted to refuse treatment offered by Caterpillar that might mitigate Caterpillar's liability for workers' compensation benefits if his decision is within the bounds of reason or his doctor's. But that's not what is at issue in this case at all. Instead, the medical services and pharmaceuticals recommended in the life care plan are petitioner's choice of treatment that he has asked the commission to order Caterpillar to pay. Petitioner acknowledges that Rockford-Clutch involved the refusal of some type of surgery, but he's claiming that the Supreme Court's holding applies in all types of choices patients make in treatment and that its language is not limiting. Petitioner's incorrect. Under Section 8A, he's only entitled to recover reasonable medical expenses necessary to diagnose or cure the effects of his injury. He's not entitled to recover expenses for all medical services and pharmaceuticals that he desires that happen to be within the bounds of reason. Petitioner cites no authority for his position that the Rockford-Clutch bounds of reason exception, which is an exception to Section 19D, also applies to Section 8A reasonable unnecessary determination. And that's because it doesn't. So the petitioner's first contention on appeal that Rockford-Clutch reasonable bound standard applies to a Section 8A petition for medical expenses is incorrect. Instead, the reasonable unnecessary standard applies. And this court's standard of review is to review for a decision that's against the manifest weight of the evidence, which can be shown where the opposite conclusion is clearly apparent, as the court well knows, and or where no rational trier of fact could have agreed with the commission. It's Caterpillar's position that petitioner has forfeited any argument that the commission's denial or limitation of any of the various medical services or pharmaceuticals was against the manifest weight of the evidence. And this is because petitioner does not adequately explain why the opposite conclusion than those reached by the commission were clearly apparent or why no rational trier of fact could have agreed. He can't just point to a contrary opinion, for example, and argue that the commission erred. He has to explain further why the commission's decision was clearly wrong or no one could agree. And the classic example of a decision by the commission that's not against the weight of the evidence where it chooses between two credible medical opinions. And by and large, that's what we have in this case. Or we have decisions that are just plainly supported by the record. And even after Caterpillar pointed out petitioner's forfeiture in its appellees brief, petitioner still does not, in our view, advance a rule 341 H7 compliant argument in his reply. Instead, respectfully, he essentially takes the position that this court's review is not impaired by his forfeiture. And while that may be, it doesn't excuse his compliance with rule 341 H7 and it doesn't excuse the forfeiture. So Caterpillar respectfully submits that this court can affirm the commission's decision in this case on forfeiture grounds alone, should it see fit to do so. Putting the forfeiture aside, the commission's 8A determinations as to the necessity of the medical services and pharmaceuticals within the life care plan were not against the manifest weight of the evidence. It's important to recognize that the commission awarded the majority of the medical services and pharmaceuticals recommended in the life care plan and only reduced or tapered the recommended opioids and benzodiazepines. The denials of the medical services and the tapering of those pharmaceuticals were based on record evidence and the opinions of various physicians and were not contrary to the manifest weight of the evidence because it cannot be said that no rational trier of fact could have agreed with the commission. Petitioner challenges the denial of essentially 13 categories of medical services and pharmaceuticals that both sides have discussed in our briefs. Caterpillar submits that we can quickly dispense with three of those categories, the epidural injections, the MRIs, and grouped together, the lidoderm patches and Voltaren gel. The of radiculopathy, a condition that the commission previously found that petitioner failed to satisfy his burden to show that they were causally related to the work injury and that finding has been previously affirmed by this appellate court. Caterpillar also submits that we can quickly dispense with the recommended catamine infusions and sympathetic blocks as yet to be prescribed treatments that have not been incurred, for that reason, have not been incurred within the meaning of Section 8A. However, they were, if I recall correctly, prescribed for in the life care plan. They're recommended in your honor, they're recommended in the life care plan, but what the commission seized on was that no treating physician had yet prescribed them. Correct. And what's your authority for the treating physicians being the only prescriber of that type of treatment? Well, it's not a prescription, your honor. That's a recommendation by an expert, essentially. And our authority, I don't remember the case now, but your honors are well familiar with the rule that if a treatment or pharmaceutical is prescribed and not yet administered, it's incurred within the meaning of Section 8A. Caterpillar submits that if it's not subscribed, the opposite is true. And it's not yet, if it's not prescribed by a treater, it's yet to be incurred within the meaning of Section 8A. That's how Caterpillar reads the commission's decision anyway, with regard to the issue you're asking me about. With regard to this issue, are you familiar with the case of Compass Group? Not as I sit here, your honor. So, it's finding no basis for the requiring of an item within a life care plan to be prescribed by a physician? You're not familiar with that case? I'm sorry, your honor, I don't have it. The commission's denial of integrated manual therapy, physical therapy and acupuncture were not contrary to the manifest way to the evidence. Because these are situations where the commission simply chose between differing medical opinions as to the necessity of these medical services as is its role. And in particular, with respect to physical therapy, it was not denied, but rather ordered only in the event of a chronic regional pain syndrome flare-up. So, the commission's decision there is based on record evidence and opinions of the physicians and completing its role to select among those. The commission determined that prospective hospitalization was too speculative as to frequency and duration to be presently medically necessary, commenting that perhaps no hospitalizations would be required. And therefore, that decision was also not against the manifest way to the evidence. The commission denied the spinal cord stimulator pursuant to section 19D. So, here's the proper application of section 19D. Because petitioner had previously refused to undergo the spinal cord stimulator implantation under section 19D, the commission in its discretion is permitted to not order that and order Caterpillar to pay for that. The one-time inpatient chronic pain rehabilitation was denied as medically unnecessary because petitioner has already participated in that program. Home health care was denied as medically unnecessary for lack of a present recommendation and a failure on petitioner's part to explain why his 9 to 10 pound lifting restriction precluded him from performing the heavy cleaning, whatever that is. And as previously mentioned, the commission did not deny petitioner opioid or benzodiazepines, but rather found based on the recommendations of two physicians that a tapering program was medically necessary. Petitioner has not advanced a persuasive argument explaining how that determination was against the manifest way of the evidence either. So, Caterpillar's position is that none of the medical services or pharmaceuticals that were either limited, denied, or ordered tapered were contrary to the manifest way to the evidence in this case. And respectfully requests that this court affirm the June 13th to 2024 decision of the commission. Thank you. Any questions from the court for Mr. Drinkwine? I guess just to recap it, if it's not prescribed in your opinion, it can't be awarded prescribed by a current trader. Yeah, I think that was the rationale in the commission's decision. You know, the number of. Well, it sounds like it was, but I mean, you're also saying that's the law that's. Judge Kavanaugh citing it. I'm not going to prove reasonable and necessary. Is that it's prescribed. That was the position that we have argued in our brief. Judge Kavanaugh just cited me to a case. I haven't read that. I can't speak to that. But, yes, short of that being controlling that's Caterpillar's position. Thank you. Thank you. For the questions any. Okay, thank you. Council. Council block. You may reply. Thank you, your honor. As far as the attack on our arguments, your honor. I believe all the cases and, of course, it is a matter of great discretion in any event for the appellate court, but I believe most the cases say the whole idea of the rule is so the court can appreciate the issues in the case. And I think if the court reviews our arguments on the individual modalities and the medications, each one argues very well that it's the opposite result is clearly evident without using the magic words. And if that were the case, a lesser standard, such as de novo review would equal the same result. So, again, the magic words aren't there, but I think you'll find in all of it's a very strong argument. And with due respect, I disagree that the commission all they did was follow the court's mandate. I don't think there were a number of modalities where they didn't. For example, with the medications, the opioids and benzodiazepines, the complaint was that they didn't work together. And to be honest, that's a side effect and side effects again, our choice of a patient. It shouldn't be a choice of the commission. We're going to protect you, so to speak. I think that's the patient choice as it is with all medications in the practice of medicine. And with the complaint being that they shouldn't be taken together, what they did is they denied both the opioids and the benzodiazepines. No one has stated a reason why benzo shouldn't be used. And as far as opioids go, and again, this is something that commission has ignored, and I hope the appellate court doesn't ignore it. That's what is evidence-based. That's what Dr. Carlson wrote, and it's very true. We're talking about treatment that has worked for decades, that they're taking away from them. And again, I think under any standard that's wrong, but I really think the reasonable bounds standard makes sense because if it's within reasonable bounds, by definition, it's reasonably required to cure or relieve from the effects of the accidental injury. And that's what we're dealing with. The difference is a standard for the defense to bar treatment, and I think it should be something more than a doctor disagrees. Just like Dr. Stanton-Hicks disagreed with acupuncture without any reasoning whatsoever. And Dr. Rubino is an acupuncturist who's seen it work hundreds of times treating, and she has treated CRPS patients, and she's used it on them. So again, I think this is very important for the future of injured workers, and I think reasonable bounds, by definition, is reasonable, and that's the standard in the statute. So I don't disagree with the statute. What I'm saying is that what Rockford Club said and what Bob Rudd Remodeling said applies equally to where a petitioner is seeking medical treatment and especially seeking to continue medical treatment. But there were a number of these other things like the spine stimulator. He was a younger person, presumably dating. He didn't want a box implanted in his back with electrodes up to his neck. I don't know if that's a great way to get a girlfriend or not. I'm very limited in experience in that myself, although I've been married 45 years. But if it comes to the point and it's a progressive condition where he wants it down the road, the commission has now said you can never have it because at one stage you decided not to. And that's the type of thing we've seen with this commission and with this commission decision, and it's the type of thing that tells you they shouldn't get any deference. And again, the reason is treatment within reasonable bounds is reasonable treatment. I'm sorry. I'm sorry, counsel. Who doesn't get deference? The commission. If the review is de novo, the commission gets no deference. If the review is manifest wait, they get deference. Okay. Okay. I'm sorry. I see what you're saying. All right. But anyway, some of the other things, ketamine. This commission was bound to determine not to give him really any significant medications. Ketamine was recommended by Dr. Stanton Hicks. Dr. Gruff agreed to it. They said it's not prescribed. And remember, the court's mandate was a life care plan, not what's good for next week. And that's why I think they're ignoring the court's mandate there. Sympathetic blocks. It was the same excuse. Home health care. Dr. Gruff said this was based on his observations that he needed home health care. They wouldn't give him that. Again, we covered acupuncture. Hospitalization. If this person has to go to the hospital, he'll get to the emergency room, but he'll never get a call to an adjuster that's going to authorize the hospitalization unless it's in the life care plan. That's the whole idea of a life care plan. That's what the court ordered. All the doctors that saw it, Dr. Gruff, Dr. Stanton Hicks agreed a life care plan is appropriate. And again, I can't go through all the, I'm not going to go through all the individual things. Mr. Block, maybe you can lighten this, myself included. A life care plan is not modifiable. Is that correct? No, it's modifiable. And I think Section 8A allows modification as well. But what it is, is it's a plan that is used with chronically ill or injured patients to prognosticate their care for life. That's why the prescription thing, the commission just didn't want to award it. I mean, that's not a reason for not awarding something in a life care plan. They basically scoured the record for any reason to deny any care they could, and they awarded the rest. And that's the same. So a life care plan, is that optional or not optional on the part of the claimant? Well, I think in this case, what happened is that Dr. Rubino and the utilization review, which cut off the modalities, said the reason for non-certifications, we didn't have a schedule. A life care plan gives you that. It gives you the treatment. It gives you the codes. It gives an adjuster everything they need to write and award the treatment for life. But can it be adjusted? I think absolutely. I think Section 8A allows that. I think Section 8A subsequent petitions can be filed. I think a 19D petition can be filed by the defense. But the whole idea of a life care plan is it should make it easier for the commission because everything in the life care plan that's awarded, you don't have to litigate it anymore. Yet, I think I get the feeling they resent it because they denied everything they could. Isn't it just an administrative efficiency argument on their behalf, life care plans? Well, I don't think they were happy with the life care plan, to be honest. I'm talking about the concept, not the specific case. Well, I think a life care plan is what doctors do to prognosticate what treatment should be given down the road. Yeah, so is it administrative? It makes it easier because everyone can follow the life care plan. Yeah, I just find the word easier, keeping, is constantly being used. But is that the purpose? I mean, or is... The purpose is to, first of all, after you've made the diagnosis, is to see what treatment is needed based on today's medicine. At that point in time with today's modalities of treatment. Right. That's all you have, right? Right, but a lot of these things will be for life. And again, like the opiates and benzodiazepines, they've been for over three decades. Well, yeah, but you know, tomorrow we can have a cure for cancer. It's totally speculative. You can only deal with the point in time with the, I just don't understand a life care plan. But as long as it's modifiable, is that correct? I don't think anyone quarrels with that it's modifiable. And it's basically, the whole idea of this case is to bring the practice of medicine into the practice of the Workers' Compensation Commission, Your Honor, to be honest. And if a person has to go back to the commission for everything they need for every prescription, that's really unfair to the patient. And I think it, I don't think the commission really wants that extra work. But sometimes you have gestures where it's like pulling teeth to get every ounce of treatment. And that's what a life care plan solves really. It tells you what's already authorized. I think more can be authorized. I think if something becomes inappropriate, that can be dealt with too. But that hasn't happened here. It's just two schools of thought on opioids and benzodiazepines. That's what we're dealing with. One school of which thinks it's appropriate, one is not. It's clearly within reasonable bounds of what a lot of doctors do. And that's why I really think that is the right test within the statute's definition. I'm not attacking the statute. I'm just saying the statute says reasonable and something within reasonable bounds. Even if there's differences of opinion, I think the injured person should be allowed to make the choice. Because I think especially in Illinois, choice is something between a patient and the doctor in the doctor's office. And I don't think the commission should interfere with that unless there's a darn good reason, which would be that the choice is beyond reasonable bounds. Thank you. Any questions from the bench? I don't think you've had a long day already. Thank you, Your Honor. Well, thank you, counsel, both for your arguments in this matter this afternoon. It will be taken under advisement. A written disposition will issue.